308 Ga. 624
FINAL COPY

S20A0236.  STYLES v. THE STATE.

Ellington, Justice.

A Brooks County jury found Derrick Styles guilty of felony murder and other crimes in connection with the shooting death of Alberto Lumens and the armed robbery of Juan Lumens Garcia.[1]

_____

[1] Styles and his brother, Michael Styles, were indicted by a Brooks County grand jury on April 7, 2010, for burglary (Count 1); the felony murder of Alberto Lumens, predicated on armed robbery (Count 2); the armed robbery of Alberto Lumens (Count 4); the armed robbery of Juan Lumens Garcia (Count 6); and three counts of possession of a firearm during the commission of a felony (Counts 3, 5, and 7). (The indictment shows Garcia's surname as "Zelaya," which appears to be a misnomer.) Following a joint trial on May 16 through 18, 2011, the jury found Styles and his brother guilty on all counts. On July 12, 2011, the court sentenced Styles to 20 years' imprisonment for burglary (Count 1); life imprisonment, consecutive to Count 1, for the felony murder of Lumens (Count 2); five years' imprisonment, consecutive to Count 2, for possession of a firearm during commission of the felony murder (Count 3); life imprisonment, consecutive to Count 3, for the armed robbery of Garcia (Count 6); and five years' imprisonment, consecutive to Count 6, for possession of a firearm during commission of the armed robbery (Count 7). The trial court merged Count 4 with Count 2, and Count 5 with Count 3.  Styles filed a notice of appeal on July 12, 2011, but the record was not transmitted to this Court for years. Through new counsel, Styles also filed a motion for a new trial on April 7, 2017, and an amended motion for a new trial on October 6, 2017. Following a hearing, the trial court dismissed Styles' motion for a new trial on October 26, 2017, finding that it lacked jurisdiction to consider it. Styles filed an amended notice of appeal on October 19, 2017. The appeal was docketed in this Court to the term beginning in December 2019 and submitted for decision on

Styles contends that the trial court erred in admitting into evidence a recording of an inculpatory telephone conversation between himself and a witness. He also contends that his trial counsel was ineffective for failing to object to an allegedly improper comment by the prosecutor during closing argument. Because these claims of error are without merit, we affirm.

Viewed in the light most favorable to the jury's verdicts, the record shows the following. Lumens and his son, Cesar Lumens, lived with Garcia in Garcia's Brooks County home. On the evening of July 25, 2009, the men had retired to their bedrooms after an afternoon of drinking beer. Garcia testified that he heard the front door open followed by the sounds of people talking. He left his bedroom to investigate and saw three people, two men and one woman, standing by the front door. Garcia recognized one of the men as "Nino," whom he later identified as Cornell Stephens from a photographic lineup. When Garcia walked toward the front door, the

the briefs. Michael Styles filed a separate appeal, which was docketed to the April 2020 term.

man with Stephens (later identified as Styles) pointed a gun at Garcia and demanded money. Garcia refused, and Styles struck him on the head with the gun. Styles forced Garcia to return to his bedroom. Once there, Styles rummaged through Garcia's belongings; he took a photo album, a ring, a necklace, and Garcia's wallet, which contained $400. When Styles turned his back to Garcia, Garcia pushed him through the doorway and closed the door. Styles fired twice at the door. Because Garcia had moved away from the door, the bullets did not strike him. When Garcia felt sure that the robbers had left, he looked for Lumens. He found Lumens lying on the bathroom floor, dead from a gunshot wound. Also, the $5,000 in cash that Lumens had kept in his bedroom was gone.

On July 27, Essie Hollis, the woman who entered the house with Styles and Stephens, called the police and agreed to be interviewed by GBI Agent Michael Callahan. Hollis told Agent Callahan, and also testified at trial, that she ran into Styles and his brothers, Michael and Jonathan, at a gas station on the night of the murder. Styles asked her if she wanted to "go make some money

tricking." Hollis agreed and got into the car with Styles, his brothers, and a fourth man, Lamar Jones. They stopped to pick up Stephens, and they dropped Jonathan off. Thereafter, Styles discussed with Hollis, Stephens, Jones, and his brother, Michael, a plan to rob the people at Garcia's house. They agreed that Stephens would take Hollis to Garcia's house, Hollis would have sex with the occupants of the house, find out where the money was kept, and then report back. According to Hollis, when they arrived at Garcia's home, she and Stephens executed the plan as instructed. After having sex with Lumens, Hollis went back outside, allegedly to get another condom, and told Styles where he could find money inside the house. Stephens, Jones, Styles, and Michael walked toward the house while Hollis got into the car. Hollis said she heard gunshots. She said that Michael got in the driver's side of the car. Moments later, she saw Styles and Jones run from the house toward Stephens and the car. Once everyone was in the car, Michael sped off.

Hollis testified that Styles, who had been using cocaine all evening, was acting "hyped up and crazy." Styles told her that she

had "better not run [her] mouth" and that he ought to shoot her so that she could not talk. Hollis testified that Styles was concerned that he had dropped his gun somewhere near the house and that he needed to go back and get it. Styles offered Hollis a stolen cell phone, which she declined. Hollis also testified that a surveillance video recording that the police had recovered from the gas station showed her interacting with Styles, his brothers, and Jones. Hollis was arrested on July 30, for her role in the crimes, and she later pleaded guilty to robbery.[2]

Stephens also pleaded guilty to robbery and testified at trial. Stephens testified that Styles, Michael, and Jones had asked him to pimp Hollis to Lumens and Garcia. Stephens testified that, after Styles picked him up, they all went to Garcia's home. On the way there, they talked about committing a robbery. Stephens went inside the house with Hollis. After Hollis had sex with Lumens, she went

---

[2] At the time of trial, Hollis, Stephens, and Jones had each pleaded guilty to robbery for their part in these crimes, but they had yet to be sentenced. The record indicates that the State had made no promises to them other than to inform the trial court at sentencing whether they had been cooperating witnesses.

back outside. Shortly thereafter, Stephens saw Styles and Jones enter the home; Styles had a gun. Stephens heard gunfire coming from inside the house and fled to the car. When he returned to the car, Michael was already in the driver's seat, and Hollis was in the back seat. Stephens testified that he heard two or three more shots from the house, and then Jones and Styles returned to the car. The five drove off. When they arrived at Styles' home, Jones took out a wallet and gave Hollis some money. Thereafter, Stephens drove Styles back to Garcia's house to retrieve the gun; after they found it, they drove to Valdosta. After the crimes, Styles and Michael asked Stephens where Hollis could be found. Stephens decided to go to the police because Styles had previously made threats about killing Hollis. On July 28, Stephens spoke to Agent Callahan about the crimes.

Lamar Jones also pleaded guilty to robbery and later testified at trial. Jones gave testimony corroborating Hollis' and Stephens' account of the crimes. He also testified that Hollis told them that Lumens kept his money in a dresser drawer. When he went inside

the house with Styles, he saw Styles approach Lumens, who was standing in his bathroom, wrapped in a towel. Styles began yelling at Lumens, demanding his money. Jones said he did not see Styles shoot Lumens, but he did see him shooting at Garcia's bedroom door. Jones ran outside to the car, followed by Styles, and the group sped away. Jones also testified that he had participated in another armed robbery earlier the same day with Styles and one of his other brothers, Dominique Styles.

During their investigation of the crimes, the police found a photograph taken from Lumens' home in Styles' car. The police also found two .380 bullets and five .380 shell casings in Lumens' home. One of the shell casings was found on the bathroom floor. Two bullet holes were found in Garcia's door. A bullet was recovered from the door frame and another was recovered from Garcia's bedroom. A third bullet was recovered from Lumens' body. The ballistics expert who examined the bullets and shell casings testified that the five shell casings had markings indicating that they had been ejected from the same gun. The bullets had matching lands and grooves that

also indicated that they had been fired from the same gun. However, without a gun to test the bullets and casings against, he was unable to determine if the bullets had been fired from the same gun that had ejected the shell casings. The medical examiner testified that Lumens' cause of death was a gunshot wound to the chest.

Michael turned himself in on August 25, and Styles was arrested in Texas on September 22, 2009. Styles elected not to testify in his defense, but he presented three alibi witnesses.

1. Styles does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Styles guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Styles contends that the trial court erred in admitting, over

his objection, a recorded telephone conversation between Hollis and a man whom she identified at trial as Styles based on her familiarity with his voice. Styles objected to the admission of the recorded conversation because, based on a pre-trial statement that Hollis had given an investigator, Hollis claimed that she had never spoken to Styles on the phone, did not know his phone number, could not identify his voice, and believed the caller was Styles because he had identified himself as Styles. The trial court overruled the objection. Styles argues the court's ruling was erroneous because the State had failed to demonstrate a sufficient basis for identifying Styles' voice.

Under the old Evidence Code, which applies in this case, we held that "[a]lthough voice identification testimony is generally considered to be direct evidence, Georgia courts have construed such testimony to be opinion evidence, which, of course, is inadmissible unless the witness discloses the basis for his opinion." (Citation and punctuation omitted.) *Brown v. State*, 278 Ga. 369, 371 (2) (602 SE2d 834) (2004). In addition,

proof of telephone conversations may be admissible in

> evidence when the identity of the person against whom the conversation is sought to be admitted is established by circumstantial as well as direct evidence. The probative value to be accorded such evidence is a matter for the jury's determination.

(Citations and punctuation omitted.) Id.[3]

At trial, Hollis admitted that she had not been entirely truthful when she first spoke with Agent Callahan. She testified that she had, in fact, spoken with Styles on the phone before. She explained that she was familiar with his voice because she knew him and she had spoken with him in person on the night of the crimes. Additionally, Styles made statements during the phone conversation from which the jury could infer that he was well-acquainted with Hollis and that his name was "Derrick" because he responded to that name. Because the State presented a sufficient basis for identifying Styles' voice, the trial court did not err in admitting into evidence the recorded conversation. See *Brown*,

---

[3] Styles was tried before January 1, 2013, so the old Evidence Code applies in this case. See *Graves v. State*, 298 Ga. 551, 553 (2) n.2 (783 SE2d 891) (2016). Authentication of telephone conversations is now governed by OCGA § 24-9-901.

supra at 371 (2) (trial court correctly allowed victim to testify that the voice of an assailant she heard but did not see belonged to the defendant, where testimony concerning voice identification was based on victim's previous interactions with defendant and knowledge of her voice).

3. Styles contends, for the first time on appeal, that his trial counsel was constitutionally ineffective when he failed to object during closing argument when the prosecutor referred to Styles and his brothers as the "Styles family army." He contends that the statement was prejudicial and required reversal because it implied that Styles was involved in gang activity.

Generally, when a preserved[4] ineffective assistance

---

[4] The State contends that this claim of error has been waived because it was not raised in a valid motion for a new trial. The record shows, however, that this appeal was the first opportunity that appellate counsel had to raise the claim. Styles' trial counsel filed a notice of appeal on July 12, 2011. After trial counsel was permitted to withdraw from the case on May 5, 2016, new appellate counsel entered an appearance on June 29, 2016. On April 7, 2017, new counsel filed a motion for a new trial raising claims of ineffective assistance. The trial court lacked jurisdiction to consider the motion for a new trial, however, because the "filing of a notice of appeal divests the trial court of jurisdiction to alter a judgment while appeal of that judgment is pending." (Citation and punctuation omitted.) *Pruitt v. State*, 282 Ga. 30, 35 (5) (644 SE2d 837) (2007). The trial court dismissed the motion for a new trial, and this

of counsel claim is raised for the first time on appeal, we must remand for an evidentiary hearing on the issue. But remand is not mandated if we can determine from the record that the defendant cannot establish ineffective assistance of counsel under the two-prong test set forth in *Strickland* [*v. Washington,* 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984)].

(Citations and punctuation omitted.) *Anthony v. State*, 302 Ga. 546, 554 (V) (807 SE2d 891) (2017). An evidentiary hearing is not necessary in this case because we can determine from the record that this claim of error is without merit.

The trial transcript shows that the prosecutor, while recounting the testimony of the State's witnesses during closing argument, said: "Lamar Jones is a lieutenant in the Styles' family army here." That colorful characterization of Jones' relationship with the Styles brothers was based on Jones' testimony that he had participated in the charged armed robbery with Styles and his brother Michael and a prior armed robbery with Styles and his brother Dominique. There was no allegation by the State of gang

appeal is therefore new counsel's first opportunity to raise a claim of ineffective assistance of trial counsel. Accordingly, the claim of error is not waived. See *Ruiz v. State*, 286 Ga. 146, 148-149 (2) (b) (686 SE2d 253) (2009).

activity or affiliation during the course of the trial.

"A closing argument is to be judged in the context in which it is made," and a prosecutor has wide latitude "to argue reasonable inferences from the evidence.". *Scott v. State*, 290 Ga. 883, 885 (2) (725 SE2d 305) (2012). That three of the Styles brothers had participated in armed robberies with Jones was admitted in evidence. Thus, the prosecutor was afforded wide latitude in arguing inferences from that evidence, including characterizing Styles and his brothers as an "army" of robbers. See *Patterson v. State*, 124 Ga. 408, 409 (1) (52 SE 534) (1905) ("It is quite natural, and by no means unusual, for an advocate, in discussing the facts of a case before a jury, to indulge to some extent in imagery and illustration. Sometimes a simile may be inapt, or the metaphor mixed, or the expression may be hyperbolical. What the law forbids is the introduction into a case, by way of argument, of facts not in the record and calculated to prejudice the accused." (citation and punctuation omitted)). Because the argument was permissible, defense counsel was not constitutionally deficient for failing to object

to it. See *Faust v. State*, 302 Ga. 211, 220 (4) (c) (805 SE2d 826) (2017) (Where the prosecutor's argument was based on permissible inferences and supported by the facts in evidence, trial counsel's failure to make a meritless objection to the State's closing argument was not evidence of ineffective assistance.).

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 4, 2020.
Murder. Brooks Superior Court. Before Judge Hardy.
*Conger & Smith, Gregory D. Smith*, for appellant.
*Bradfield M. Shealy, District Attorney, J. David Miller, Michelle T. Harrison, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General*, for appellee.